## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

Phyllis M. Alston,
               Plaintiff,

             – against –

Thomas Jefferson University Hospitals,
CVS Pharmacy, Inc.,
Lankenau Medical Center,
Dr. Sara R. Hefton,
Dr. Matthew D. Vibbert,
Main Line Health,
Mary RN Unknown,
Dr. Robyn E. Massa and
Dr. Charles F. Breish,
             Defendants.

Civil Action No.: 2:24-cv-00093

## VERIFIED COMPLAINT

Plaintiff Phyllis M. Alston ("Alston"), represented by her attorney Alson Clayton Alston, Esq. (PA Bar Id #333339), hereby complains of CVS Pharmacy, Inc. ("CVS"); Thomas Jefferson University Hospitals ("Jefferson"); Lankenau Medical Center ("Lankenau"); Dr. Sara R. Hefton, the neurologist who supervised the care of Mrs. Margaret Morris at Jefferson for the first approximately five days that Mrs. Morris was a patient at that facility ("Dr. Hefton"); Dr. Matthew D. Vibbert, the neurologist who supervised her care at Jefferson for approximately her final week at Jefferson and up to the moment of the death of Mrs. Morris ("Dr. Vibbert "); Mary RN (Unknown last name), the registered nurse who was the principal caregiver of Mrs. Morris on the overnight shifts of the last 2 nights of Mrs. Morris's life ("Mary RN Unknown"); Dr. Robyn E. Massa, Mrs. Morris's neurologist at Main Line Health ("Dr. Massa"); and Dr. Charles F. Breish, Mrs. Morris's primary care physician and geriatric specialist at Main Line Health ("Dr. Breish"); collectively, "Defendants," as follows:

## INTRODUCTION

Margaret Morris was 91 years old on Christmas Day, December 25, 2021.  She had a long history of minor strokes, one major stroke in 2013 and suffered from type 2 diabetes, hypertension, dementia and crippling osteoarthritis.  Unfortunately, she suffered 2 seizures on Christmas 2021 and was rushed to Lankenau, then Medivacced to Jefferson so that she could be monitored using an EEG machine which, allegedly, Lankenau did not have.

The evidence shows that, from the time Mrs. Morris arrived at Jefferson on 12/26/2021 to the moment of her death at Jefferson on 1/8/2022, Jefferson and its employees treated her, Plaintiff Phyllis Alston ("Alston"), Mrs. Morris's son Alson Clayton Alston ("Al") and their siblings with varying degrees of indifference, contempt and negligence because Jefferson and its employees did not value them as full human beings due to their race, African-American.  Jefferson's indifference, contempt and negligence, by and through its employees, caused them to fail to give Mrs. Morris proper care, lie about the care they did give her, fail to obtain informed consent for two medical procedures and create the conditions that would lead to her massive stroke and fatal heart attack while at Jefferson.  Jefferson's actions, by and through its employees, violated Title VI of the Civil Rights Act of 1964, Medicare and Medicaid; and the negligence of all of the Defendants make them subject to wrongful death, survival actions and other torts under Pennsylvania law, as described below.

Plaintiff brings this action against all of the named Defendants to obtain justice for Mrs. Margaret Morris and her family, as well as others who will be treated by these Defendants.  In this matter, we will present the following facts and prove the following by a preponderance of the evidence:

1.  Dr. Hefton, Mrs. Morris's initial ICU neurologist at Jefferson, informed her family that Mrs. Morris had shown clinical signs of autonomous, defensive movements on her first day there, including when she tried to stop the doctor from putting in a breathing tube by raising her arm, though she did not speak, did not appear to be awake and was not in distress.  Dr. Hefton said that a CT scan revealed that she had not suffered a stroke on Christmas and that she would likely be released to go home with anti-

2

seizure medications by the end of the week.  Dr. Hefton told her son that Mrs. Morris would first be given an MRI exam later that day to confirm that she had not experienced a stroke and that the EEG would be monitoring her for any new strokes, in the meantime.

2.   However, Jefferson's indifference, contempt and negligence caused them to delay the urgently needed and prescribed MRI from the mere hours after her arrival (a time period that Dr. Hefton had told her son was very short, due to medical necessity) to an inexplicable <u>four</u> days after her arrival.  When they finally gave her an MRI, she had suffered a new, massive bilateral stroke from which she would likely not recover and that Dr. Hefton suddenly, falsely, grotesquely and negligently stated must have occurred <u>before</u> her arrival to Jefferson.  This was a dramatic departure from all previous conclusions and statements of Dr. Hefton, based on CT scans, EEG negative results and clinical observations.

3.   Jefferson's indifference, contempt and negligence caused Mrs. Morris to be almost completely unmedicated, for a significant portion of the duration of her stay at Jefferson, against the very strokes and heart attacks her records clearly showed she was, otherwise, prone to suffer.

4.   Jefferson's indifference, contempt and negligence caused them to give her two procedures (a Lumbar test for infection and a tracheostomy) using inexperienced doctors, against her son's wishes, and failed to inform him of the risks and alternatives to those procedures.  Jefferson's indifference, contempt and negligence caused them to remove her from the EEG for the Lumbar procedure, BEFORE she had been given the prescribed MRI exam that would have proven conclusively whether she had suffered a stroke and gauged both its extent and type, if any.  Jefferson's indifference, contempt and negligence caused them to fail to reconnect her to the EEG after the Lumbar procedure.  Again, this was a period BEFORE an MRI had been completed and when she was medically unprotected against stroke and heart attack.

5.   Jefferson flatly refused to reconnect her to the EEG machiner upon the repeated requests of her family.

6.   Jefferson's indifference, contempt and negligence caused them to refuse to honor her son's wishes and the medical history from Lankenau that showed she had a heart arrhythmia that often generated false blood pressure and pulse readings from automated, machine-generated results, so that they needed to perform occasional manual readings.  One doctor, Dr. Patel, actually yelled and screamed at Al, then stormed out of Mrs. Morris's room when he requested that she take a manual blood pressure and pulse reading to confirm the machine readings.

7.   Jefferson's indifference, contempt and negligence caused them to allow her pulse to rise to a range of 86-103 on 1/7/2022, the afternoon before she died, when her sitting pulse at home was generally approximately 67 and her pulse was approximately 72 on the morning of 1/7/2022.  The staff refused to address her son's requests to address the elevated pulse readings.

8.   Jefferson's indifference, contempt and negligence caused them to hire and poorly train a nurse, Mary RN Unknown, who refused to make her rounds to Mrs. Morris during the first 1.5 hours of her overnight shift on each of the last two nights of Mrs. Morris's life.  This nurse demonstrated to Al that she did not care about her responsibilities to Mrs. Morris or about the fact that she was violating Jefferson policy.  She was contemptuous of Al's questions and concerns about her care for his mother. She was the last nurse on duty the morning of 1/8/2022, when Mrs. Morris died.

9.   CVS negligently failed to include Plavix in Mrs. Morris's medicine pack, causing her to become far more likely, according to Dr. Hefton, to have a stroke.  Dr. Massa and Dr. Breish failed to give timely second opinions, missing an opportunity to insist that Jefferson give Mrs. Morris an immediate MRI, have only properly trained staff perform medical procedures on this 91-year old, and obtain informed consent for medical procedures.  Lankenau negligently transferred Mrs. Morris to a facility (Jefferson) because it had an EEG machine, without instructing them that it was medically necessary for her to remain connected to the EEG until an MRI revealed whether she had suffered a stroke; without instructing them that it was medically necessary to have an MRI immediately; without informing them of Ms. Morris's heart arrhythmia that could affect automatic machine blood pressure

4

readings; and without instructing them that her condition made it medically necessary for her to be put back on Plavix and Eloquis as soon as the MRI had been completed (depending on whether a stroke had occurred and the type of stroke, if any).

10. As a result of Jefferson's indifference, contempt and negligence, by and through their employees, and the negligence of CVS, Lankenau, Dr. Massa and Dr. Breish, Mrs. Morris, hard-working mother of 11 children and widow of a retired Philadelphia police officer and navy veteran, suffered and died at Jefferson, needlessly, depriving her of potentially many more years of life and her family many more years of her wisdom, love and support.  Since her death, her family has been struggling to cope with the sudden and inexplicable death of a woman who Dr. Hefton stated would likely be released within days to return home.  Managing her estate has proven to be difficult, sometimes impossible.

11. Jefferson, CVS, Lankenau and Mainline Health had a duty of reasonable medical care, reasonable supervision, reasonable training.  The actions of Jefferson, by and through its employees, Dr. Hefton, Dr. Vibbert and Mary RN Unknown; CVS; and Mainline Health and Lankenau, by and through their employees, Dr. Massa and Dr. Breish, represented a breach of this duty in that they were negligent and that negligence was the direct and proximate cause of Mrs. Morris's stroke at Jefferson, her suffering and her death by the first heart attack she had ever experienced.  Therefore, the Defendants are properly the subjects of wrongful death, survival claims and other torts.

12. Jefferson's indifference, contempt and negligence violated Mrs. Morris's rights under Medicare, Medicaid and Title VI of the Civil Rights Act of 1964.  This deprivation of her rights permits plaintiff to bring a claim under **28 U.S.C. § 1343(a)(4)**, with supplemental jurisdiction under 28 U.S.C. § 1367 of wrongful death, medical malpractice and other personal injury claims.  Note that Jefferson receives federal funding, which is a prerequisite for applicability of Title VI.

13. This action has one purpose – to obtain justice from Mrs. Margaret Morris by holding Defendants accountable for their indifference, contempt and negligence.  We hope that whatever facts

are uncovered through this action help other elderly patients of the Defendants, particularly in the case of Jefferson and its employees, the very African-Americans that Jefferson so clearly does not value equally to white patients.

### THE PARTIES

14. Plaintiff Phyllis M. Alston is a daughter of Mrs. Margaret Morris.  She is a citizen of Virginia.

15. Defendant Thomas Jefferson University Hospitals, Inc., dba Thomas Jefferson University Hospital, dba Jefferson Health, is a non-profit whose headquarters and principal place of business is at 111 S. 11th Street, Philadelphia, PA, 19107.  It operates several hospitals in the Philadelphia area, including the hospital which treated Mrs. Morris, which is at 111 S. 11th Street, Philadelphia, PA 19107.  Thomas Jefferson University Hospital receives significant federal funding, which subjects it to the jurisdiction of Title VI of the Civil Rights Act of 1964 (42 U.S.C. §§ 2000d *et seq.*).

16. CVS Pharmacy, Inc. is a national pharmacy with retail store and online sales units.  Its headquarters is at One CVS Drive, Woonsocket, Rhode Island 02895.  CVS supplied Mrs. Morris with her medicines through its online facility known as SimpleDose.

17. Defendant Lankenau Medical Center is a hospital whose address is 100 East Lancaster Avenue, Wynnewood, PA 19096.  It is owned and operated by Main Line Health.

18. Defendant Main Line Health is a non-profit which operates several hospitals in the Philadelphia area and offers medical services through individual practitioners.  Its headquarters is at 240 North Radnor Chester Road, Radnor, PA 19087.

19. Defendant Dr. Sara R. Hefton is a medical doctor and neurologist licensed by the Commonwealth of Pennsylvania.  At all relevant times, Defendant Hefton had a place of business at Thomas Jefferson University Hospital, 111 S. 11th Street, Philadelphia, PA, 19107 and was employed by Thomas Jefferson University Hospital.

20. Defendant Dr. Michael D. Vibbert is a medical doctor and neurologist licensed by the

Commonwealth of Pennsylvania.  At all relevant times, Defendant Vibbert had a place of business at Thomas Jefferson University Hospital, 111 S. 11th Street, Philadelphia, PA, 19107 and was acting in his capacity as an employee of Thomas Jefferson University Hospital.

21. Defendant Mary RN Unknown appears to be a registered nurse licensed by the Commonwealth of Pennsylvania and whose full name is unknown to Plaintiff at the time this Complaint was filed.  At all relevant times, Defendant Mary RN Unknown had a place of business at Thomas Jefferson University Hospital, 111 S. 11th Street, Philadelphia, PA, 19107.

22. Defendant Dr. Robyn E. Massa is a medical doctor and neurologist licensed by the Commonwealth of Pennsylvania who failed to give a second opinion about the treatment of Mrs. Morris at Jefferson, desperately and repeatedly sought by the Morris family, that could have prevented much of the harm that was to befall Mrs. Morris.  At all relevant times, Defendant Massa had a place of business at Main Line Health, 100 East Lancaster Avenue, Wynnewood, PA 19096.

23. Defendant Dr. Charles F. Breish is a medical doctor licensed by the Commonwealth of Pennsylvania who failed to give a second opinion about the treatment of Mrs. Morris at Jefferson, desperately and repeatedly sought by the Morris family, that could have prevented much of the harm that was to befall Mrs. Morris.  At all relevant times, Defendant Breish had a place of business at Main Line Health, 100 East Lancaster Avenue, Wynnewood, PA 19096.

**JURISDICTION**

24. Jurisdiction is proper, pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) because a federal civil rights question is raised, pursuant to 28 U.S.C. § 1343(a)(4), with regards to a violation of Mrs. Morris's rights under Title VI of the Civil Rights Act of 1964 (42 U.S.C. §§ 2000d *et seq.*), Medicare and Medicaid; and 28 U.S.C. § 1367 (supplemental jurisdiction), which covers the wrongful death claim under 42 Pa.C.S. §§ 8301-3, as well as medical malpractice, survival and other personal injury claims herein, because those events arise from the same case or controversy as the federal claims.

**VENUE**

25. Venue is proper, pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claims herein occurred in this judicial district.

**FACTUAL BACKGROUND**

26. Margaret Morris was 91 years old on Christmas Day, December 25, 2021.  She had a long history of minor strokes, one major stroke in 2013, and suffered from type 2 diabetes, hypertension, dementia and crippling osteoarthritis.

27. At approximately 10PM on Christmas 2021, she suffered what appeared to be 2 seizures in rapid succession, while lying in her bed and tended to by her home health aide ("HHA") and her youngest son, Al.  EMTs rushed her to Lankenau Medical Center, which had always delivered to her compassionate care that respected her personal dignity.

28.  Covid-19 restrictions prevented her son from entering the ICU, but he was in constant communication with her doctors there.  In anticipation of their request for her current medicines, he looked at her CVS SimpleDose monthly medicine packets and saw that CVS had failed to put in her critical anti-stroke medicine, 75mg of Plavix, for the prior 6 weeks.  He informed her ICU doctor at Lankenau of this fact.

29. Lankenau put Mrs. Morris on a ventilator for precautionary purposes, performed a CT scan

and said that there was no evidence of a stroke. They transferred her to Jefferson by Medivac because, they stated, Jefferson had an EEG machine and Lankenau did not.

30. Her primary doctor at Jefferson's ICU spoke to Al at approximately 6AM and reported that she had been successfully hooked up to an EEG machine. Al also informed them that she had not been given Plavix for the prior 6 weeks. The doctor later told him that Jefferson had performed a CT scan and agreed with Lankenau that she had not suffered a stroke. Her neurologist at Jefferson, Dr. Hefton, informed Al that Mrs. Morris was responding to diagnoses and treatment well and would likely be released by the end of the week. She stated that Mrs. Morris would be given an MRI later that day because it was essential to learn from it whether Mrs. Morris had actually suffered a stroke of any kind on Christmas, which was one day earlier.

31. Mrs. Morris did not receive an MRI until the fourth day at Jefferson, a delay that was only explained, nonchalantly by Dr. Hefton, as something that they just didn't get around to.

32. Jefferson's EEG readings showed that she experienced NO STROKES for the first 2.5 days she was there [12/26-12/28 afternoon]. Jefferson insisted that they needed to test for an infection via a Lumbar procedure to extract spinal fluid. They never told Al that they would remove her from the EEG machine to do the test and that they would not perform the MRI before the test. Al insisted that only their most experienced doctors perform the procedure, but they pressured Al into accepting a team that included inexperienced doctors who were being trained. They said that she could not get the procedure done unless he agreed to the team approach – and that she needed the procedure. He reluctantly agreed because he felt that he had no choice.

33. On her fourth day at Jefferson, she was given an MRI exam. The next day, Dr. Hefton met with Al and, via conference call, her other children. She informed them that the MRI had revealed that Mrs. Morris had suffered one or more massive strokes on both sides of her brain and that she would likely not recover.

34. Dr. Hefton also stated that Mrs. Morris had not been given any Plavix or Eloquis during her

time there and had not been given any other anti-stroke or blood thinner medicines.

35. Dr. Hefton also stated that her condition had deteriorated from the first day because she had attempted to push the ventilator tube away, on that first day, when they tried to insert it, but had no conscious or autonomous responses or defense mechanisms recently.  Al had not been told by Jefferson that he could visit his mother until the third day there, so he cannot confirm any of her responses prior to that time.

36. Since there was no record of her having a stroke before her arrival at Jefferson or while at Jefferson thru the afternoon of 12/28/2021, it was clear that Mrs. Morris had suffered the stroke(s) during or after the afternoon of 12/28/2021 (her third day at Jefferson, after she was removed from the EEG machine to perform the Lumbar procedure).  One Asian male doctor stated that she likely did, in fact, have the stroke during or after the Lumbar procedure because that was the only time she had not been monitored by the EEG.  He also stated that she had no clinical signs of brain activity per the various auditory and sensory tests he administered, periodically, since the Lumbar exam.

37. By her second day at Jefferson, Al starting asking her doctors at Main Line Health for second opinions of the use of CT scans, delay in the MRI exam, failure to give her Eloquis and Plavix, the necessity of the Lumbar procedure, removing her from the EEG machine, etc.  They did not reply until approximately one week later, when all of the serious decisions had been made.  Their responses were non-medical, perfunctory and better characterized as political, advising Al to let the doctors at Jefferson do what they thought was best.

38. On approximately 1/3/2021, her doctors insisted that they must perform a tracheostomy on Mrs. Morris.  Al would not voluntarily consent unless they ensured him that only their most experienced surgeons would perform the operation.  Jefferson said that they would have a team, including inexperienced doctors, and that the surgery would not be performed otherwise.  Al reluctantly agreed because he felt he had no choice.  On 1/5/2021, Jefferson performed the tracheostomy.  On 1/6/2021, Mrs. Morris developed pneumonia from the surgery and she had internal bleeding from the

surgery.  Her blood pressure and pulse became dramatically elevated and she labored to breath, experiencing clearly visible abdominal breathing as she had two years earlier during her first bout with pneumonia in her life.  They gave her a sedative for her blood pressure and pulse.  Her blood pressure decreased significantly to 90/50, though the diastolic of 50 was much lower than normal, and her pulse was lowered to about 72, which was close to her normal pulse of about 67.  However, she still experienced heavy abdominal breathing through the time visiting hours ended on 1/6/2022.

39. Out of an abundance of caution, Al had asked several medical practitioners at Jefferson, during the course of her stay, to take manual blood pressure and pulse readings because automatic machine readings had been shown to be incorrect in the past, due to her heart arrhythmia.  Not one such professional complied.  On the night of 1/6/2021, of particular note, an Indian doctor named Dr. Patel yelled and threatened Al when he made those requests of her.  She became angry and stormed out of the room, leaving Al to question if she would harm his mother later.  (Thirty-six hours later, Mrs. Morris would die suddenly, leaving her family to continue to question her care.)

40. Mary RN Unknown began caring for Mrs. Morris on the overnight shift of 1/6-7/2021.  She was at least 1.5 hours late for her first visit to Mrs. Morris's room and never introduced herself to Al, as the other RNs had.  In fact, Al never saw her enter Mrs. Morris's room, so she might have taken several additional hours to make that initial visit to Mrs. Morris.  Mary RN Unknown seemed disinterested and unconcerned when Al tracked her down.  A different nurse told Al the next morning (1/7/2022) that Mrs. Morris's breathing tube had "popped out" when they (the different nurse and Mary RN Unknown) were changing her.  As well, a 20-year singing toy, precious to the Morris family, that Al had left with Mrs. Morris was no longer working after Mary RN Unknown's first shift with Mrs. Morris.  It had never failed prior to that night or the 20 years since Mrs. Morris had purchased it from traveling vendors passing by her store on Girard Avenue in Philadelphia.  Al thought it must have been thrown to the floor with force, out of anger or spite, because it had dropped numerous times over the past 20 years and had not been damaged.

41. Mrs. Morris's abdominal breathing stopped by the morning of 1/7/2022 and she began breathing normally.

42. Her family met with Dr. Vibbert on 1/7/2022, who said that he would "aggressively" try to wean her off the ventilator by Monday 1/10/2022 for a better pick of treatment facilities.  Her family had never imagined that this timing might be a huge red flag and Dr. Vibbert never said that he would do anything risky.  Her family later concluded that, by "aggressive," he would allow her pulse to rise significantly, as her 91-year-old body fought to breath during the periodic cessation of the use of a breathing tube during the weaning process.

43. For the rest of 1/7/2022, her pulse rose to a range of approximately 86-103.  This was well above her resting pulse of 67 which her family typically saw at her home for the prior 5 years.  Al commented to her staff that this was much too high, but his concerns were ignored.

44. After visiting hours ended on 1/7/2022, Al saw that Mary RN Unknown was assigned to his mother again.  Again, she had not checked on Mrs. Morris during her first hour on duty.  Al waited for her at the nurse's station and felt extremely uncomfortable with her distant and unapologetic attitude when she surfaced.  He chose not to say anything to her about her tardiness and failure to perform her duties because he feared that she might harm his mother overnight.

45. Mrs. Morris's family received a call at approximately 3:30 AM on 1/8/2022, that there was an event, that their mother's heart had stopped beating and that her doctors were trying to resuscitate her.  They ultimately failed and pronounced her dead.  They told her children that her pulse during the event was 87; the doctor who called them was not alarmed by this.  Her children had never heard of this doctor before.

46. Despite their repeated efforts, Dr. Vibbert did not return their phone calls, texts or emails for 4 days after their mother had died.  When he did call them, he was very pleasant, but did not tell them exactly why mom died on 1/8.  He said that her vitals were consistent with a pulmonary embolism that probably formed in her legs.  She had never experienced a heart attack before this, but had been on

Eloquis, before this, for 10 years.  He stated that medical equipment had captured a reading of her pulse at 130 just before her heart stopped and around the time that Mary RN Unknown made her second of only 2 checks on Mrs. Morris that overnight.  Mrs. Morris's children have never received any further explanation of what happened to their mother, overnight, on 1/7-8/2022.


## CAUSES OF ACTION

### COUNT 1
**VIOLATION OF TITLE VI OF THE CIVIL RIGHTS ACT OF 1964 AND 28 U.S.C. § 1343(A)(4)**
**AS TO DEFENDANTS**
**THOMAS JEFFERSON UNIVERSITY HOSPITALS, MAIN LINE HEALTH,**
**DR. HEFTON, DR. VIBBERT, MARY RN UNKNOWN, DR. MASSA AND DR. BREISH**

47. Paragraphs 1 thru 46 are incorporated by reference herein.

48. Plaintiff Alston brings this action as the daughter of Mrs. Morris.

49. Defendants exacted racially discriminatory treatment upon the 91-year old Margaret Morris, based on her race, African-American, causing her to suffer one or more bilateral strokes and die of a blood clot entering her heart while a patient at Thomas Jefferson University Hospital.  She was transferred to Thomas Jefferson University Hospital after having suffered only seizures, no strokes, and she had exhibited numerous autonomous reflexes upon her arrival, further demonstrating that she had not yet suffered the debilitating stroke(s) she would suffer at Thomas Jefferson University Hospital.

50. This racial discrimination included one or more doctors and nurses demonstrating contempt for her care; negligently delaying giving Mrs. Morris a critical MRI for four days; failing to obtain informed consent for 2 surgical procedures, but performing them nonetheless; negligently accepting a CT scan as definitive proof that she did not have a stroke instead of giving her an immediate and more reliable MRI exam, but still inexplicably and negligently denying her anti-stroke and anti-heart attack medicines that could have prevented her strokes and terminal heart attack suffered while a patient at Thomas Jefferson University Hospital; Dr. Massa and Dr. Breish failed to give timely second opinions, missing opportunities to insist that Jefferson give Mrs. Morris an immediate MRI, have only properly

trained staff perform medical procedures on this 91-year old, and obtain informed consent for medical procedures.  These acts led directly to her death on January 8, 2021.

51. Thomas Jefferson University Hospital also negligently failed to train, supervise, oversee, and discipline its doctors and nurses adequately to prevent discriminatory treatment.

52. These are equal protection violations that are also in violation of Medicare and Medicaid rules and policy, giving rise to a claim under 42 U.S.C. § 1983.

53. WHEREFORE Plaintiff respectfully demands as follows:

    a.   All compensatory damages permitted by law;

    b.   All punitive damages permitted by law;

    c.   Any other relief which the learned Court deems just and proper.

**COUNT 2**
**WRONGFUL DEATH**

54. Paragraphs 1 thru 53 are incorporated by reference herein.

55. Plaintiff Alston brings this action as the daughter of Mrs. Morris, pursuant to 42 Pa.C.S. § 8301(a-b).

56. Defendants owed a duty of care to Mrs. Morris that they breached through negligent acts.  It was neither too far nor too remote for each of the Defendants to foresee that the consequences of failing to execute their duties would lead to one or more strokes, heart attacks and the death of Mrs. Morris.

57. The unconscionable and negligent delay in failing to give Mrs. Morris an MRI for four days meant that Jefferson could not use the best and readily available medical instruments to determine whether Mrs. Morris had experienced a stroke of any sort.  Jefferson made the determination that she had not suffered a stroke, in the absence of MRI results, by relying upon a CT scan, EEG results and clinical observations.  After making that determination, however, they refused to protect her against a new stroke by negligently failing to provide her with the critically needed, previously prescribed anti-stroke and anti-heart attack medications that her son informed her were not in her system, due to the

negligence of CVS.  Since they truly believed, to a medical certainy, that she had not suffered a stroke, even in the absence of an MRI exam, they had a duty to give her the strong anti-stroke medicines that were then absent from her system to prevent a stroke from occurring.  But, they negligently failed to provide these medicines, therefore failing to protect her against a new stroke while under their negligent care.

58. Alternatively, Jefferson could have concluded that she <u>might</u> have suffered a stroke before her arrival, since an apparently unreliable CT scan was given to her during those first 4 days.  Per this consideration, they should have increased to the highest priority her need for an MRI, so she could be treated, immediately, and with certainty, to prevent ongoing or future stroke damage to her brain, whichever case existed.  But, they negligently failed to give her an immediate MRI, even in this more generous scenario.

59. Jefferson negligently failed to train its staff to obtain informed consent from Al or the other children of Mrs. Morris for medical procedures.  Instead, they negligently and unlawfully pressured him to allow inexperienced doctors to experiment on his mother or, they stated explicitly to him, that she would have been denied care.  Jefferson negligently removed Mrs. Morris from the EEG before an MRI could have diagnosed a stroke and then, similarly negligently, refused to put her back on an EEG after the Lumbar procedure.

60. CVS negligently failed to include Plavix in her 30-day medicine pack, causing her to become far more likely, according to Dr. Hefton, to have a stroke.

61. Dr. Massa and Dr. Breish failed to give timely second opinions, missing opportunities to insist that Jefferson give Mrs. Morris an immediate MRI, have only properly trained staff perform medical procedures on this 91-year old, and obtain informed consent for medical procedures.

62. Lankenau negligently transferred Mrs. Morris to a facility (Jefferson) because Jefferson had an EEG machine, without instructing them that it was medically necessary for her to remain connected to the EEG until an MRI revealed whether she had suffered a stroke; without instructing them that it

was medically necessary to have an MRI immediately; without informing them of Ms. Morris's heart arrhythmia that could affect automatic machine blood pressure readings; and without instructing them that her condition made it medically necessary for her to be put back on Plavix and Eloquis as soon as the MRI had been completed (depending on whether a stroke had occurred and the type of stroke, if any).

63. Those negligent acts were the actual and proximate cause of Mrs. Morris suffering one or more major strokes and/or heart attacks while in Thomas Jefferson University Hospital and to die in the ICU on January 8, 2022.

64. WHEREFORE Plaintiff respectfully demands as follows:

a.  Written policy changes for Lankenau, Main Line Health, Dr, Massa and Dr. Breish that they will provide timely, written, medically relevant, material second opinions for all of their patients within 24 hours of each request, or they will have a competent peer issue the second opinion; these opinions will be specific and never state that the doctors giving the first opinion should simply be trusted;

b.  Damages for the loss of services (including profound emotional and psychological loss suffered), society, advice, guidance, tutelage and comfort that Mrs. Morris would have provided or contributed had she lived.

c.  Damages for reasonable hospital, nursing, medical, funeral expenses and expenses of administration necessitated by reason of injuries causing death;

d.  Damages for lost retirement, investment and other income as a result of the wrongful death of Mrs. Morris;

d.  Damages in excess of the jurisdictional limit for arbitration, in compensatory damages, with lawful interest thereon and costs of suit;

e.  Punitive damages for the wrongful death of Mrs. Morris;

f.  Any other relief which the learned Court deems just and proper.

16

**COUNT 3**
**SURVIVAL ACTION**

65. Paragraphs 1 thru 64 are incorporated by reference herein.

66. Plaintiff Alston brings this action as the child of Mrs. Morris, pursuant to 42 Pa.C.S. § 8302. This action is for damages that Mrs. Morris would have recovered for negligent acts of the Defendants, up to and including the time she was treated in Thomas Jefferson University Hospital, had she lived. Plaintiff steps into her shoes for these claims as a Trustee of the Morris estate.

67. Defendants owed a duty of care to Mrs. Morris that they breached through negligent acts.  It was neither too far nor too remote for each of the Defendants to foresee that the consequences of failing to execute their duties would lead to her pain and suffering on or about December 25, 2021 as well as while she was in Thomas Jefferson University Hospital thereafter; her being comatose until she died; her suffering one or more strokes; her suffering one or more heart attacks; and the unexpected death of Mrs. Morris while in the care of Jefferson.

68. Those negligent acts were the actual and proximate cause of Mrs. Morris's suffering and loss on or about December 25, 2021, as well as the pain and suffering she experienced while in Thomas Jefferson University Hospital and her inability to regain consciousness after suffering one or more massive bilateral strokes while a patient at Thomas Jefferson University Hospital.

69. WHEREFORE Plaintiff respectfully demands as follows:

    a.   Damages for pain and suffering immediately preceding, during and after one or more seizures and strokes on or near December 25, 2021;

    b.   Damages for the loss of services (including profound emotional and psychological loss suffered), society, advice, guidance, tutelage and comfort that Mrs. Morris would have received from her family had she been conscious after suffering seizures and massive strokes on or near December 25, 2021;

    c.   Damages for reasonable hospital, nursing, medical and expenses of administration

necessitated by reason of injuries on or near December 25, 2021 and up to the

moment of her death in Thomas Jefferson University Hospital;

g.  Damages in excess of the jurisdictional limit for arbitration, in compensatory

damages, with lawful interest thereon and costs of suit;

h.  Punitive damages for the negligent acts of Defendants prior to, but ultimately

causing the wrongful death of Mrs. Morris;

i.  Any other relief which the learned Court deems just and proper.

## COUNT 4
## MEDICAL TREATMENT WITHOUT INFORMED CONSENT

70. Paragraphs 1 thru 69 are incorporated by reference herein.

71. Plaintiff Alston brings this action as the daughter of Mrs. Morris, pursuant to 42 Pa.C.S. § 8301(a-b).

72. Defendants owed a duty to Mrs. Morris to obtain her informed consent prior to performing

surgery.  40 Pa. C.S. § 1303.504.  This duty of informed consent requires physicians to advise the

patient of those material facts, risks, complications and alternatives to surgery that a reasonable person

in the patient's situation would consider significant in deciding whether to have the operation.

Montgomery v. Bazaz-Shegal, 568 Pa. 574, 584; 798 A.2d 742, 748 ( 2002).  An operation without the

patient's consent constitutes a battery. Montgomery v. Bazaz-Shegal, 568 Pa. 574, 584-86; 798 A.2d

742, 749-50 ( 2002).

73. Thomas Jefferson University Hospital did not obtain informed consent before giving Mrs.

Morris a Lumbar procedure because they had never informed her son Al that she would be removed

from the EEG during the procedure; that she would never be placed back on the EEG after the

procedure; that the determination they reported to him that she had NOT suffered a stroke during the

first 2.5 days of her stay at Jefferson might not have been carefully and conclusively made, since she

had not yet received an MRI; that she could have been given special medications to treat or prevent

stroke damage to her brain had she been given an MRI on the first day of her stay at Jefferson, if the MRI had shown evidence of a stroke; and that she had yet to be placed back on Plavix and Eloquis.

74. He would have declined the procedure if he knew these facts.  They further told him that she must obtain the procedure, but that she would be denied the procedure unless he consented to inexperienced doctors being on the team performing the procedure.  This was coercion and did not permit him the free exercise of consent that the doctrine of informed consent requires.

75. Thomas Jefferson University Hospital did not obtain informed consent before giving Mrs. Morris a tracheostomy because they told her son Al that she must obtain the procedure, but that she would be denied the procedure unless he consented to inexperienced doctors being on the team performing the procedure.  This was coercion and did not permit him the free exercise of consent that the doctrine of informed consent requires.

76. WHEREFORE Plaintiff respectfully demands as follows:

    a.   Compensatory damages for the lack of informed consent.

    j.   Damages in excess of the jurisdictional limit for arbitration, in compensatory damages, with lawful interest thereon and costs of suit;

    k.   Punitive damages for the lack of informed consent;

    l.   Any other relief which the learned Court deems just and proper.

**SPECIFIC CONCLUSIONS REGARDING THE NEGLIGENCE OF DR. HEFTON**

77. All of the above claims are related, in some manner, to the failure of Dr. Hefton to administer the MRI to Mrs. Morris on the first day that Mrs. Morris arrived at Jefferson.  Therefore, we must take a closer look at the negligence of this action, considering both of the competing conclusions of Dr. Hefton.  Far from exonerating Dr. Hefton, each demonstrates that her negligence caused significant injury to Mrs. Morris.

78. The doctors at Lankenau and Jefferson were confident that Mrs. Morris had not suffered a

stroke from the period immediately preceeding Christmas Day 2021 through the moment of the Lumbar procedure, based on CT scans at Lakenau and Jefferson, clinical testing and observations by Dr. Hefton upon the arrival of Mrs. Morris (which she reported to Mrs. Morris's family on that first day), the negative results of the EEG readings until the disconnection of the EEG machine at the commencement of the Lumbar procedure and the clinical observations of an Asian male doctor both prior to the Lumbar exam and after the Lumbar exam. The most likely period that Mrs. Morris could have suffered the massive bilateral stroke from which she never recovered, according to the facts of the case and the medical opinion of the Asian male doctor, was during or just after the Lumbar procedure.

79. The negligently delayed MRI exam was not given until a day after the Lumbar exam and it showed evidence, for the first time, of a massive stroke suffered by Mrs. Morris. Dr. Hefton immediately lied to the family of Mrs. Morris about the stroke, conveniently stating a conclusion that was completely contrary to her prior statements and contrary to all other evidence, that the stroke must have occurred prior to Mrs. Morris's arrival at Jefferson.

80. Dr. Hefton doubled-down on her new theory and convenient lie by stating that a CT scan is not conclusive as to the presence of a stroke; only an MRI is. This statement only compounded the conflicting statements of Dr. Hefton, however. The observations of the entire medical staff who had treated Mrs. Morris at Lankenau and Jefferson, prior to the MRI, was <u>not</u> based on CT scans alone, but was based on multiple clinical tests and observations, both before and after the Lumbar procedure, by numerous staff. Even if a CT scan is not conclusive of a stroke, the totality of the evidence and the medical opinions of staff clearly showed that Mrs. Morris had not suffered a stroke prior to the Lumbar procedure, therefore she experienced the massive bilateral stroke <u>after</u> the Lumbar procedure and while in the care of Jefferson and Dr. Hefton.

81. Yet, for the sake of argument, let us assume that Dr. Hefton's late-found theory that Mrs. Morris suffered her massive stroke <u>prior</u> to her arrival at Jefferson was correct and that only an MRI could conclusively have determined the presence or absence of a stroke. Then, the negligence of Dr.

Hefton is undeniable, for she should <u>never</u> have waited for four days to give Mrs. Morris an MRI exam – given her beliefs about the unreliability of the CT scan.  In fact, Dr. Hefton told the family of Mrs. Morris that it was critical that she give Mrs. Morris an MRI on that first day of her arrival at Jefferson.  The failure to give Mrs. Morris an immediate MRI, when viewed through the revisionist lenses of Dr. Hefton about Mrs. Morris having a stroke <u>prior</u> to her arrival at Jefferson, points an unmistakable finger of intentional neglect at Dr. Hefton.  This is because Dr. Hefton, in this scenario, knowingly failed to diagnose whether Mrs. Morris was experiencing a stroke and suffering massive brain damage by refusing to give her an immediate MRI exam.  This negligence captures, in this stroke-prior-to-Jefferson scenario, the utter failure of Dr. Hefton to give Mrs. Morris medications upon her arrival that could have saved brain tissue.

82. The failure to give Mrs. Morris an MRI immediately upon her arrival at Jefferson, then, <u>either</u> caused Dr. Hefton to be negligent in treating an existing stroke that the MRI would have surely uncovered (Dr. Hefton told her family that she had not prescribed any medications for Mrs. Morris during the first few days) <u>or</u> surely caused Dr. Hefton to be knowingly ignorant as to the presence of stroke and whether Mrs. Morris could be placed back on strong anti-stroke medications without fear of causing bleeding in her brain.  Irrespective of how Dr. Hefton spins her actions, it is abundantly clear that Dr. Hefton was negligent in failing to give Mrs. Morris an immediate MRI so that an appropriate treatment regimine could be administered to prevent further damage to her brain tissue (if Mrs. Morris had already experienced a stroke) or to prevent a stroke altogether (if she experienced a stroke only after she was in Jefferson's care).

83. Yet, when one considers the vast array of clinical observations, the negative EEG readings, the initial statements Dr. Hefton gave to Mrs. Morris's family, it is clear that the staff of two hospitals were certain that Mrs. Morris had not suffered a stroke until under the care of Dr. Hefton and only after she had been removed from the EEG machine – <u>without</u> the informed consent of her family.

84. There really is no mystery here, just the certainty that Dr. Hefton came to the false and

revisionist conclusion that Mrs. Morris suffered a stroke <u>prior</u> to her arrival at Jefferson as a convenient lie to mask the negligent failure of Dr. Hefton to give Mrs. Morris an immediate MRI.

85. And, when one considers the dismissive attitude of Dr. Hefton when describing the delay in administering the MRI (per paragraph #31, above, the delay was only explained, nonchalantly by Dr. Hefton, as something that they just didn't get around to), one sees a level of animus that is at the heart of the assertions of racial discrimination the family suffered at Jefferson.  Dr. Hefton and Jefferson, like Dr. Patel and Mary RN Unknown's visible hatred for Mrs. Morris and her family, like the doctors who denied the family of Mrs. Morris informed consent on two occassions, like Dr. Vibbert "aggressively" allowing the pulse and blood pressure of Mrs. Morris to rise to levels significantly higher than her normal readings up until the moment of her death, did not care about the life of this 91-year-old African-American elder, so they treated her contemtuously and rushed her to her death through their negligence and intentional cruelty.


**I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.**

Dated: January 8, 2024         <u>s/ Phyllis M. Alston          </u>
                               Phyllis M. Alston
                               Manassas, VA

                               <u>s/ Alson Clayton Alston, Esq.</u>
                               Alson Clayton Alston, Esq.
                               Philadelphia, PA